David M. Baum (Bar No. 214571)
david@dbaumlaw.com
DAVID BAUM LAW CORPORATION
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067
(310) 552-9100

Attorneys for plaintiffs ARMLA One, Inc.,
ARMLA Two, Inc., and Gompers SocEq, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMLA ONE, INC., ARMLA TWO, INC., AND GOMPERS SOCEQ, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, LOS ANGELES DEPARTMENT OF CANNABIS REGULATION, CAT PACKER, AND DOES 1-100, <br><br> Defendants. | Case No.: 2:20-cv-07965 <br><br> **COMPLAINT** <br> **1. 42 U.S.C. § 1983 Equal Protection** <br> **2. 42 U.S.C. § 1983 Due Process** <br> **3. 42 U.S.C. § 1983 Equal Protection** <br> **4. 42 U.S.C. § 1983 Dormant Commerce Clause, Round One** <br> **5. 42 U.S.C. § 1983 Dormant Commerce Clause, Round Two** <br> **5. Declaratory Relief, Round One** <br> **6. Declaratory Relief, Round Two** <br><br> **JURY TRIAL DEMANDED** |

1
COMPLAINT

**INTRODUCTION**

Plaintiffs ARMLA One, Inc. ("ARMLA One"), ARMLA Two, Inc. ("ARMLA Two"), and Gompers SocEq, Inc. ("Gompers," and collectively with ARMLA One and ARMLA Two, "Plaintiffs") bring this action against defendants City of Los Angeles (the "City"), Los Angeles Department of Cannabis Regulations (the "Department"), and the Department's Executive Director and General Manager, Cat Packer (the City, the Department, and Ms. Packer are collectively referred to herein as "Defendants"). In this Complaint, Plaintiffs have brought federal causes of action. ARMLA One has filed a Governments Torts Claim Act notice with City and will amend this Complaint to add its state law claims after the expiration of the mandatory waiting period.

**PARTIES**

1. Plaintiff ARMLA One, Inc. is a corporation organized under the laws of the State of California.

2. Plaintiff ARMLA Two, Inc. is a corporation organized under the laws of the State of California.

3. Plaintiff Gompers SocEq, Inc. is a corporation organized under the laws of the State of California.

4.      Defendant City of Los Angeles is a municipal corporation located in the County of Los Angeles, State of California.

5.      Defendant Los Angeles Department of Cannabis Regulation is a Department of the City of Los Angeles.

6.      Defendant Cat Packer is the Executive Director and General Manager of the Department of Cannabis Regulation.  Plaintiffs sue Ms. Packer in her official capacity.  In addition, ARMLA One sues Ms. Packer in her personal capacity.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over the matters asserted herein under 28 U.S.C. section 1331 because the action involves questions under the United States Constitution.

8.      The Court has personal jurisdiction over the City because it is a citizen of California.

9.      The Court has personal jurisdiction over the Department because it is a citizen of California.

10.     The Court has personal jurisdiction over Ms. Packer because, on information and belief, she is a citizen of California.  Moreover, Ms. Packer performed the action complained of herein while within California.

11.     Venue is proper in this Judicial District under 28 U.S.C. section 1391(a) because all Defendants reside in this Judicial District and under 28 U.S.C. section 1391(b) because Defendants performed the actions complained of herein while within this Judicial District.

## RELEVANT FACTS

### A. The Phase Three, Round One Cannabis Application Process

12.     Defendants established laws to govern the application process for licenses to operate cannabis businesses within the City of Los Angeles.  The application process is divided into three phases, with retail cannabis licenses (known as Type 10 licenses) awarded to new businesses in Phase Three.[1]  Phase Three is further divided into two rounds.  The Phase Three, Round One application period opened September 3, 2019 at 10:00 a.m. and closed September 17, 2019 at 10:00 a.m.  Defendants have not announced the dates for the Phase Three, Round Two application period as of the filing of this lawsuit.

---

[1] The Phase One application period was limited to retail cannabis licenses for preexisting medical marijuana dispensaries and ran from January 3, 2018 through March 4, 2018.  The Phase Two application period was limited to non-retail licenses for preexisting medical marijuana businesses and ran from August 1, 2018 through September 13, 2018.

13.     ***Property requirements***.  An Applicant in Phase Three, Round One was required to submit an executed lease agreement with proof of a deposit or a property deed for its Business Premises.  L.A.M.C. § 104.06.01(c)(2).[2]  The Business Premises were required to be a specified distance away from sensitive uses: "Outside of a 700-foot radius of a School, Public Park, Public Library, Alcoholism or Drug Abuse Recovery or Treatment Facility, Day Care Center, and Permanent Supportive Housing; and outside of a 700-foot radius of any other Retailer or Microbusiness Commercial Cannabis Activity having on-site retail sales, which is licensed by the state of California and licensed by the City to engage in the Commercial Cannabis Activity defined in [Section 105.02]." L.A.M.C. § 105.02(a)(1)(B).  The Business Premises could not have been the site of Unlicensed Commercial Cannabis Activity in violation of Section 104.15 on or after January 1, 2018.  L.A.M.C. § 104.06(a)(1)(x).

14.     ***Social Equity requirements***.  Only Applicants owned in part by Tier 1 or Tier 2 Social Equity Applicants verified by the Department were eligible to apply for licenses in Phase Three, Round One.  L.A.M.C. § 104.06.1(c)(1) ("To be

---

[2] Defendants amended the Code in 2020 to move the rules governing Phase Three, Round One applications to Section 104.06.1(b).  The references in this section of the Compliant are to the Code in effect on September 3, 2019.

eligible to apply in Round 1, an Applicant shall have an individual Owner that is a Tier 1 or Tier 2 Social Equity Applicant verified pursuant to Subsection (b) of this section and who shall own an Equity Share in the Applicant who meets the requirements in Section 104.20.")

15.     A Tier 1 Social Equity Applicant is a person who (1) has a Low Income and (a) a prior California Cannabis Arrest or Conviction or (b) a minimum of five years' cumulative residency in a Disproportionately Impacted Area and (2) owns at least 51 percent of the Equity Shares of the entity that receives the retail cannabis license.  L.A.M.C. § 104.20(c).

16.     A Tier 2 Social Equity Applicant is a person who (1) has (a) a Low Income and a minimum of five years' cumulative residency in a Disproportionately Impacted Area or (b) a minimum of 10 years' cumulative residency in a Disproportionately Impacted Area and (2) owns at least 33 1/3 percent of the Equity Shares of the entity that receives the retail cannabis license.  L.A.M.C. § 104.20(d).

17.     "Disproportionately Impacted Area" means "eligible zip codes based on the 'More Inclusive Option' as described on page 23 of the 'Cannabis Social Equity Analysis Report' commissioned by the City in 2017, and referenced in Regulation No. 13 of the Rules and Regulations, or as established using similar

criteria in an analysis provided by an Applicant for an area outside of the City."

L.A.M.C. § 104.20(b).  The eligible zip codes published by Defendants are 90001,

90002, 90003, 90008, 90011, 90013, 90014, 90016, 90021, 90027, 90033, 90037,

90043, 90044, 90057, 90058, 90059, 90061, 90062.

18.  *The selection process*.  Phase Three, Round One had two selection

criteria, depending on whether the Applicant's Business Premises were in an area

of Undue Concentration.  An Area of Undue Concentration is one that, in relevant

part, has more than one retail cannabis license per 10,000 residents.  L.A.M.C. §

104.01(a)(28).  Certain areas reached Undue Concentration before the opening of

the Phase Three, Round One application period because of retail cannabis licenses

awarded to preexisting medical marijuana dispensaries in Phase One.

19.  To determine which selection criteria applied to an Applicant,

Defendants determined whether the Applicant's Business Premises fell within an

area of Undue Concentration as of the date of the application.  L.A.M.C. §

104.06.1(c)(3)(iii).  Prior to the opening of the Phase Three, Round One

application period, Defendants announced that six of Los Angeles's 36 Community

Plan Areas had reached Undue Concentration (Central City; Central City North;

Harbor-Gateway; Sherman Oaks–Studio City–Toluca Lake–Cahuenga Pass; Sun Valley–La Tuna Canyon; Venice).[3]

20.     For Applicants whose Business Premises were not in Community Plan Areas of Undue Concentration on September 3, 2019, the Phase Three, Round One application process was a race.  Under the law as of September 3, 2019, only the first 75 Tier 1 Applicants and the first 25 Tier 2 Applicants to submit applications during the application period would win the right to proceed with retail cannabis licensing.  L.A.M.C. § 104.06.1(c)(1) ("The first 75 Tier 1 Applicants and the first 25 Tier 2 Applicants who meet the requirements of this subsection shall be eligible for further processing pursuant to Section 104.06.")  Defendants required Applicants to submit their applications through the online Accela platform. The application period opened on September 3, 2019 at 10:00 a.m. and closed September 17, 2019 at 10:00 a.m.

21.     For Applicants whose Business Premises were in Community Plan Areas of Undue Concentration on September 3, 2019, Phase Three, Round One was not a race.  Instead, Defendants required such Applicants to file "a request that

_____

[3] *See* Public Convenience or Necessity Application Process, Los Angeles Department of Cannabis Regulation, *available at* https://cannabis.lacity.org/licensing/PCN-1.

the City Council find that approval of the License application would serve public convenience or necessity, supported by evidence in the record" (a "PCN Request"). L.A.M.C. § 104.03(a).  Defendants accepted PCN Requests during the same application period, September 3 through September 17, 2019.

### B. **Plaintiffs' Applications**

22.    Plaintiffs embody the goals of the City's Social Equity Program. They are companies owed by individuals unaffiliated with "big cannabis." Plaintiffs' owners have a demonstrated commitment to Los Angeles and its underserved communities.  From 2002 to 2005, Plaintiffs' founder taught in a Title I public school in South Los Angeles located within a Disproportionately Impacted Area.  At the time, the founder attempted to move into a Disproportionately Impacted Area through a Department of Housing and Urban Development program that allowed teachers to purchase foreclosed homes through a lottery process, but he was not selected in the lottery.

23.    When Plaintiffs' founder learned of the Social Equity Program, he contacted many qualifying individuals and informed them about the program. These individuals were all unaware of the Social Equity Program before Plaintiffs' founder contacted them.  Twelve of those individuals applied to be verified as Social Equity Applicants with help from Plaintiffs' founder.

24.     ARMLA One's Social Equity Applicant was a star student of Plaintiffs' founder who earned a scholarship to attend college; ARMLA Two's Social Equity Applicant was another favorite former student; and Gompers's Social Equity Applicant is a relative of ARMLA One's Social Equity Applicant. All three Plaintiffs applied for retail cannabis licenses in Phase Three.  ARMLA One applied with a Business Premises not in a Community Plan Area of Undue Concentration.  ARMLA Two and Gompers applied with Business Premises in Community Plan Areas of Undue Concentration.

25.     On August 27, 2019, Plaintiffs' founder contacted Ms. Packer and others at the Department by email and warned them that he had heard from a contact in the industry that applicants purportedly connected to a former city official would be able to upload application documents to the Accela platform before the opening of the Phase Three, Round One application race on September 3, 2019 at 10:00 a.m.  Plaintiffs' founder urged Defendants: "Please respond by telling us whether it is possible now, or at any time in the past has been possible, to upload application documents to the city's system prior to September 3 at 10:00 am.  If it is possible, please provide instructions on how to do so and confirm that the upload option will be available after midnight tonight, and will be equally available to all social equity applicants."

26.     On the morning of August 28, 2019, the Department responded to Plaintiffs' founder by email, stating "Applicants applying in Round 1 will have to upload all documents associated with their Round 1 application on or after 10 a.m. on September 3rd when they log into Accela. There is no way for an applicant to pre-upload Round 1 documents before 10 a.m. on September 3rd. Any documents they may have uploaded to the user account of a verified Social Equity Applicant cannot be transferred to a Round 1 application record."

27.     On the afternoon of August 28, 2019, Plaintiffs' founder responded to the Department's email and asked for a meeting with Ms. Packer and the Department's attorney, whether in person or by telephone, to discuss the possibility that applicants would be able to apply early.  Defendants never responded to that email.

28.     On or about August 27, 2019, Plaintiffs' founder performed a review of Plaintiffs' applications in anticipation of the opening of the Phase Three, Round One application period.  A Google Maps search showed for the first time that a preschool was planning to move within 700 feet of ARMLA One's Business Premises.  The preschool was not open, and its website stated only that it planned to open on an unspecified date in September 2019.  At the time ARMLA One entered the lease for its Business Premises, Google Maps did not indicate that a

preschool was planning to move there, nor was Plaintiffs' founder able to discover that information when he drove around the neighborhood to vet the Business Premises or through his Internet searches.

29.   At the end of August 2019, ARMLA One learned that Defendants included an option on their online licensing map that showed sensitive uses.  The licensing map did not show the preschool in question.  Instead, the licensing map showed that a different daycare occupied the same building.  In reality, that daycare had moved to a different part of the city far outside of the 700-foot buffer zone.

30.   The required documentation for Phase Three, Round One applications included "a dated radius map including horizontal lines and labeling of any sensitive uses relative to a [retail cannabis] License."  L.A.M.C. § 104.06.1(c)(2). Applicants were required to submit a signed form attesting, "The Applicant has conducted a diligent, good-faith inquiry to determine whether the proposed Business Premises is located within a 700-foot radius of any sensitive use specified in Los Angeles Municipal Code Section 105.02(a)(1)(B). Based on this inquiry, the Applicant attests that it has not identified any applicable sensitive use within a 700-foot radius of the proposed Business Premises."

31.    Plaintiffs' founder finalized ARMLA One's application documents the night before the Phase Three, Round One application period opened.  Plaintiffs' founder confirmed on the California Department of Social Services website that the preschool had not received a license.  Notwithstanding that the preschool did not qualify as a sensitive use because it had not opened and had not received a license, ARMLA One disclosed the potential sensitive use in its application. ARMLA One saved a copy of the California Department of Social Services webpage showing that the preschool did not have a license as of September 2, 2019 and submitted it with ARMLA One's application.

32.    On September 3, 2019, ARMLA One tested the Accela login shortly before 10:00 a.m. to confirm the Department had been truthful in its August 28, 2019 email when it stated that no Applicants could log in before 10:00 a.m. Accela did not allow ARMLA One to login, so ARMLA One believed that Defendants were truthful that Phase Three, Round One would be a fair race.

33.    ARMLA One was one of the fastest non-cheating Applicants in the Phase Three, Round One race.  Defendants' records show that ARMLA One signed onto the Accela application system at 10:00:12 a.m. and completed its application in one minute and seven seconds.  ARMLA One spent much of that one minute and seven seconds waiting for the Accela system to load webpages and

upload ARMLA One's application documents because of system lag caused by Accela being overrun with Applicants.  ARMLA One accomplished this without the use of "bots" or any automated assistance.  As discussed below, Defendants would later produce records showing that only three Applicants who did not log in early completed their applications before ARMLA One, which qualifies ARMLA One for a license as a Tier 2 Social Equity Applicant.

34.    Approximately 762 Applicants submitted applications during the Phase Three, Round One race for Applicants with Business Premises not in areas of Undue Concentration.

35.    On September 10, 2019, ARMLA One discovered that the California Department of Social Services had updated its website to reflect that the preschool had received a license.  Although the Department of Social Services website showed the preschool as unlicensed as of the opening of the Phase Three, Round One application period, the Department of Social Services backdated the preschool's license to August 22, 2019.

36.    ARMLA One immediately updated Defendants on the development. On September 10, 2019, ARMLA One wrote to Ms. Packer and the Department's attorney by email.  The email states in part: "We have learned that a business received a state license to operate a day care center within 700 feet of us this week.

The department of social services website showed the center as unlicensed when we submitted our cannabis application on September 3.  We did not know about the center when we entered the lease on our property. [¶] I understand that we cannot change the location of our property before we receive a state license.  Is there any option available to us, such as applying for a waiver?"  Defendants did not respond to this email.

37.     On October 22, 2019, Defendants announced ARMLA One as one of the winners of the Phase Three, Round One application process.  Defendants issued ARMLA One the $9,075 invoice for winning applicants. ARMLA One paid the invoice and Defendants accepted the payment.

38.     Beginning in approximately late October 2019, ARMLA One's owners and representatives made several telephone calls and paid several visits to the Department and several City Councilmembers' offices to discuss their application and the possibility of relocating.  Nobody with authority would speak to or meet with ARMLA One at that time.

39.     On October 24, 2019, ARMLA One wrote a letter to each of the City Councilmembers with a copy to Ms. Packer.  The letter states: "I write to you regarding the Round 3, Phase 1 application process. My application is among the first 100 submitted. My property qualified on the date I submitted the application,

but a school has since moved within the buffer zone. [¶]  I ask that you amend the regulations to allow candidates that were within the first 100 and had qualifying applications at the time of submission to relocate to other properties that do not interfere with any of the remaining 100 applicants."

40.     On October 25, 2019, ARMLA One learned Defendants were considering a Draft Ordinance, dated October 18, 2019, to amend the Los Angeles Municipal Code (the "Code") regarding retail cannabis licensing.  Under the proposal, a retail cannabis business could operate within 700 feet of a daycare if the daycare received its state license on or after the date the retail cannabis business applied for a license; and could operate within 700 feet of a school if the school received its state license after the date the retail cannabis business applied for a license and the school first opened for use by students after the retail cannabis business received its city and state license.

41.     That same day, ARMLA One wrote to the City Councilmembers, Ms. Packer, and the City Planner.  ARMLA One pointed out the deficiencies of Defendants' proposed revision.  As to daycares, the letter states: "[T]he proposed ordinance allows cannabis applicants to proceed if a daycare center within the buffer zone received its license after the September 3, 2019 cannabis application date.  I ask you to modify the proposed ordinance so that applicants may proceed if

the daycare center was listed as unlicensed on the California Department of Social Services ("DSS") license search website as of September 3." As to schools, the letter states: "[T]he proposed ordinance applies the same change listed above to schools. It, however, retains the exception that a cannabis applicant is ineligible if the school accepts students, even without a license, before the cannabis applicant receives its city and state license. This exception renders the change for the school's license date meaningless. A school will always be able to accept students before a cannabis applicant receives a state license." The letter explained ARMLA One's situation regarding the preschool and asked, "As an alternative, we ask that the City allow applicants in our position—where the California DSS website did not disclose the sensitive use until after September 3—to relocate to another property that does not interfere with any of the other Round 3, Phase 1 selected applicants."

42.   On December 2, 2019, Defendants sent a letter to ARMLA One that revoked its selection as one of the 100 winning applicants for retail cannabis licenses from Phase Three, Round One. The Department's Assistant Executive Director of Licensing sent the revocation letter at the direction of Ms. Packer.

43.   ARMLA One's owners and representatives continued to try to meet with Defendants and the City Councilmembers after Defendants revoked ARMLA

17
COMPLAINT

One's selection.  In February 2020, ARMLA One was able to schedule a meeting with a City Councilmember's designee for March 2020 to discuss ARMLA One's application.  At the March meeting, the designee assured ARMLA One's founder that the City Councilmember and his office would look into reinstating ARMLA One's selection as one of the 100 winning Applicants.  The City Councilmember's office stopped responding to ARMLA One in April 2020, which ARMLA One attributed to office closures due to the coronavirus.

C. **Defendants Allow Rule Violations in the Phase Three, Round One Application Race**

44.     As noted above, Defendants assured Plaintiffs by email on August 28, 2019 that "Applicants applying in Round 1 will have to upload all documents associated with their Round 1 application on or after 10 a.m. on September 3rd when they log into Accela. There is no way for an applicant to pre-upload Round 1 documents before 10 a.m. on September 3rd."

45.     Notwithstanding that representation, Defendants allowed their preferred Applicants to begin the application process before 10:00 a.m. on September 3, 2019.

46.     Defendants embarked on a misinformation campaign to cover their misdeeds.  On September 6, 2019, Defendants knowingly published a false Update

on the Department's website that states, "DCR is pleased to announce the successful launch of Phase 3 Retail Round 1 Application Processing. . .  On Tuesday, September 3, 2019 *at 10 a.m. PDT, the Department of Cannabis Regulation began accepting Phase 3 Retail Round 1 applications* from individuals verified as Social Equity Program Applicants." (Emphasis added.)[4]

47.     At some point, Defendants published a spreadsheet that purportedly showed the timestamp for all Applicants.[5]  The spreadsheet has the misleading title "Phase 3 Retail Round 1 Submissions (*09/03/19 10am* to 09/17/2019 10am)." (Emphasis added.)  As will become clear below, Defendants falsified the timestamps of Applicants who logged into Accela before 10:00 a.m. on September 3, 2019.

48.     Despite Defendants' misrepresentations, rumors began circulating that Defendants had allowed some Applicants to sign into the Accela application system before 10:00 a.m. on September 3, 2019.  A nonprofit corporation prepared

---

[4] DCR Staff, Phase 3 Retail Round 1 Application Process, September 6, 2019, *available at* https://cannabis.lacity.org/blog/phase-3-retail-round-1-application-process.

[5] Los Angeles Department of Cannabis Regulations, *Phase 3 Retail Round 1 Submissions*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/Phase%203%20Retail%20Round%201%20Application%20Submissions.pdf.

a summary of its allegations.  The nonprofit alleged that an applicant submitted a completed application at 9:51 a.m.; Defendants assigned a false timestamp of 10:01:28 a.m. to the application submitted at 9:51 a.m.; Defendants disabled security features designed to block bots for at least the first two minutes of the application period[6]; and Defendants accepted applications from bots.[7]

49.     On October 24, 2019, facing mounting public pressure, Defendants knowingly published another false Update on the Department's website.  This time, Defendants claimed that "[t]wo Applicants accessed the application minutes prior to the official launch."[8]  Notwithstanding Defendants' representation on September 6 that Defendants began accepting applications at 10:00 a.m., Defendants now admitted they "became aware of these two cases on Tuesday, September 3, 2019 while reviewing system data with Accela support staff."

_____

[6] All 100 winning Applicants submitted their applications within the first 2 minutes.

[7] California Minority Alliance, *Accela Online Submission Failure*, *available at* https://mjbizdaily.com/wp-content/uploads/2019/10/DCR-Corruption-from-CMA-copy.pdf.

[8] Cannabis Regulation Commission, *Presentation*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/10_24%20Cannabis%20Regulation%20Commission%20-%20Presentation%20re%20Executive%20Director%27s%20Report.pdf.

50.     The public pressure on Defendants continued mounting.  On October 25, 2019, an industry publication reported, "Hundreds reportedly appeared Thursday for the city's Cannabis Regulation Commission meeting, where allegations of corruption, incompetence, and basic unfairness were leveled at city officials, including Cat Packer, the head of the L.A. Department of Cannabis Regulation (DCR)."[9]

51.     On October 28, 2019, City Councilmember and Council President Herb Wesson sent a letter to Ms. Packer that states: "Over the last couple of weeks, including at the Cannabis Regulation Commission meeting last Thursday, allegations have been made that multiple applicants had access to the application portal prior to the announced start time of 10 am on Tuesday September 3rd." [10] The letter called on Defendants to "prepare a full audit and report by an independent third party not involved in the process."

_____

[9] John Schroyer, *Turmoil Abounds over Los Angeles' Latest Marijuana Business Licensing and Its Social Equity Program*, Marijuana Business Daily, October 25, 2019, *available at* https://mjbizdaily.com/turmoil-abounds-over-los-angeles-social-equity-program-latest-marijuana-business-licensing-round/.

[10] Letter from Herb Wesson, Jr. to Cat Packer (Oct. 28, 2019), *available at* https://files.constantcontact.com/857cfc13601/a0b5cea7-ecb2-4992-9d67-f46cdf6c07a3.pdf

52.     In November 2019, the Mayor directed the City to engage an independent, third-party auditor to review the Phase Three, Round One application process.

53.     By December 16, 2019, Defendants had changed their story yet again. Defendants admitted that fourteen Applicants had begun their applications before 10:00 a.m. on September 3, 2019.[11]

54.     On May 27, 2020, the City Administrative Officer sent a transmittal letter and the audit report to the Mayor and the City Council.[12]   The auditor found that 226 Applicants accessed Accela system before 10:00 a.m. on September 3, 2019.  Two Applicants submitted completed applications before Defendants even opened the Accela system on September 3.  The Department had manually reset the passwords for those two Applicants the morning of September 3.

_____

[11] *See* Emily Alpert Reyes, *L.A. Officials Say System for Pot Licenses Was Open Early. Cannabis Activists Call Foul*, L.A. Times Dec. 16, 2019, *available at* https://www.latimes.com/california/story/2019-12-16/cannabis-activists-marijuana-licensing-applications-los-angeles.

[12] City of Los Angeles Office of the City Administrative Officer, *Performance Audit of the Department of Cannabis Regulation Phase Three Application Process*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/DCR%20Phase%20III%20Round%201%20Licensing%20Performance%20Audit%20and%20Review%2003.27.2020.pdf.

55.     The auditor found that the remaining 224 early Applicants were able to access Accela because Defendants opened Accela at 9:59:46 a.m. rather than 10:00 a.m.  To put the fourteen second head start into perspective, the average application time for the first 100 Applicants was one minute and eleven seconds.

56.     Although the auditor was nominally independent, the audit report calls into question the auditor's impartiality.  The City Administrative Officer's transmittal letter provides that the auditor had existing contracts with the City.  The audit report shows the auditor bent over backwards to avoid assigning blame to Defendants.

57.     Rather than admit Defendants violated their own rules by allowing some Applicants to apply early, the audit report concludes the other applicants were wrong for waiting until the announced 10:00 a.m. to start their applications: "Some Applicants appeared to wait because of what, in hindsight, was imprecise messaging by the Department.  In some cases, the Department stated that the Application Window would open at 10:00 AM, and in other cases the Department stated that Applicants would be unable to sign on to the Accela portal until 10:00 AM—the latter was inaccurate."  In other words, the auditor created an after-the-fact justification for Defendants' misdeeds by drawing a fictitious distinction between logging into Accela and beginning an application, yet the audit report

acknowledges "there was no other system barrier preventing Applicants, once signed on [to Accela], from navigating to the application page and starting the application."

58.     Although the audit report takes the position that logging into Accela at 9:59:46 a.m. was appropriate under Defendants' application procedures, neither Defendants nor the auditor were able to point to a single example of Defendants informing Applicants they would be able to log into Accela at 9:59:46 a.m.  In fact, neither the auditor nor Defendants provided a single example of Defendants informing Applicants they could first log into Accela on September 3, 2019 at any time other than 10:00 a.m.  Moreover, the audit report acknowledges that Applicants who attempted to log into Accela on September 3, 2019 before 9:59:46 received the error message that they could not log in until 10:00 a.m.: "The Accela portal will be unavailable from Wednesday, August 28, 10 AM PDT until Tuesday, September 3, 2019, 10 AM PDT while it undergoes maintenance in preparation for the opening of the application window."

59.     The audit report goes so far as to imply the early start time for the 224 Applicants was fair because "Nearly all Applicants that signed onto the Accela Civic Platform prior to 10:00 AM did so because the Department and Accela allowed *all* Applicants to do so."  (Emphasis in original.)  The audit report makes

that statement even though, as shown above, Defendants did not inform the applicants at large that they could access Accela before 10:00 a.m.

60.     The audit report fails in another critical respect.  It approves of Defendants' "normalization" remedy for the early applications.  Of the 226 Applicants that accessed Accela before 10:00 a.m. on September 3, 2019, fourteen were able to navigate to the application forms and begin filling them out before 10:00 a.m.  Defendants normalized their application times by falsely shifting their application start times back as though the Applicants had started their applications at precisely 10:00:00 a.m.  In other words, an applicant who logged in before 10:00 a.m. and took 40 seconds to complete its application was assigned a completion time of 10:00:40 a.m.

61.     Defendants' normalization method fails in multiple respects.  First, it ignores the extremely low odds that all fourteen Applicants would have started precisely at 10:00:00 a.m.  The applications had to be entered by humans; bots were not allowed.

62.     Second, Defendants' normalization ignores the fact that if Accela had been properly disabled until 10:00 a.m., Applicants who attempted to log in shortly before 10:00 a.m. would have had a delayed start time because they would have had to wait for the login to fail and the webpage to refresh to a new login page.

Thus, applicants who attempted to login shortly before 10:00 a.m. could not have started their applications at 10:00 a.m. if Accela had been properly disabled.

63.     Third, Defendants' normalization method ignores the advantage to the 212 Applicants who logged into Accela before 10:00 a.m. but did not reach the application forms before 10:00 a.m.  The audit report acknowledges that Applicants spent an average of 32 seconds after logging into Accela to navigate to the application forms (i.e., Applicants spent an average of 32 seconds agreeing to Accela's terms and conditions and reading other webpages).  Defendants, however, did not change the application completion time for any applicant that reached the application forms on or after 10:00 a.m.  Thus, Defendants gave a head start of up to 14 seconds to 212 Applicants.

64.     Fourth, Defendants did not account for the system lag after 10:00 a.m. caused by Accela being overwhelmed by Applicants.  As noted above, ARMLA One was one of the first non-cheating Applicants to access the system (at 10:00:12 a.m.), and it spent most of its application time waiting for webpages to load and documents to upload.

65.     The audit report fails to raise these obvious defects with Defendants' normalization methodology, other than raising the problem with not normalizing the 212 Applicants who logged into Accela early but did not reach the application

forms before 10:00 a.m.  As to those 212 Applicants, the audit report

acknowledged that if Defendants has normalized those applications, eleven current

winners from the early starters would not have remained within the first 100

Applicants.  Nevertheless, the audit report concludes: "There is no evidence that

any Applicant benefited over any other Applicant as a result of Accela's account

re-enabling process. For those that started their application prior to 10:00 AM, the

Department implemented a reasonable 'normalization' process that effectively

negated any benefit [from] the early application star[t]."

66.    Despite allegations that some Applicants used bots, the auditor

reviewed less than all the data before concluding that no bots completed

applications: "We found that Accela provided application performance monitoring

data and application logs to corroborate their assertions that no bot-like behavior

was observed on September 3, 2019. Although Accela could not provide all the

supporting data and system logs that were the basis of their forensic analysis, the

data provided generally supports Accela's assertions because the activity during

September 3, 2019 does not appear to indicate any nefarious activities occurred."

67.    The audit report fails to provide information about what, if anything,

the auditor did to investigate whether Defendants colluded with any of the early

Applicants.  Nevertheless, the City Administrative Officer's transmittal letter

provides that "the Auditor found that that the DCR conducted the Phase III Round 1 licensing process in good faith, and that there was no evidence of bias or unfairness."

68.    The nominally independent, objective audit report failed to raise any real challenge to Defendants' implementation of the Phase Three, Round One application race.  Unsurprisingly, it exonerated Defendants.

D. **Defendants Settle a Lawsuit Based on the Conduct Plaintiffs Warned Defendants About Before September 3, 2019**

69.    On April 16, 2020, Social Equity Owners and Workers Association, Inc., a nonprofit corporation claiming to represent Applicants, and Madison Shockley III, an Applicant (together, the "SEOWA Petitioners"), brought a lawsuit against Defendants.  *See Soc. Equity Owners and Workers Ass'n v. Los Angeles*, No. 20STCP01426 (L.A. Super. Ct. 2020).  The SEOWA Petitioners sued Defendants for allowing Applicants to log into Accela before 10:00 a.m. on September 3, 2019.  They sought an injunction requiring Defendants to process all applications from the non-Undue Concentration race or, in the alternative, requiring Defendants to redo the Phase Three, Round One application process for applicants with Business Premises not in areas of Undue Concentration.

70.     Defendants settled the lawsuit.  In doing so, Defendants acceded to nearly all the SEOWA Petitioners' demands.  Under the settlement agreement, Defendants agreed to amend the Code.  Exhibit A to the settlement agreement contained a draft amended Code.  The settlement agreement required Defendants' counsel to recommend to the City Council that the City Council enact the draft amended Code.  The settlement agreement was not effective unless the City Council enacted the draft amended Code.  On the recommendation of Defendants' counsel, the City Council enacted the draft amended Code on or about July 1, 2020.

71.     The amendments to the Code change major aspects of the retail cannabis licensing procedures.  First, the amended Code requires Defendants to grant an additional 100 licenses to Applicants in the Phase Three, Round One race. L.A.M.C. § 104.06.1(b)(7).

72.     Second, the amended Code exempts all Applicants in the race from Undue Concentration limits.  L.A.M.C. § 104.06.1(b)(7).  The amended Code, however, retains the PCN Request requirements for the non-race Applicants with Busines Premises in the six Community Plan Areas Defendants designated as having reached Undue Concentration before September 3, 2019.  *See, e.g.*, L.A.M.C. §§ 104.03(a)(4);104.06(a)(1)(vii), (3)(ii); 104.06.1(b)(iii). The requirements include payment of an additional Public Convenience or Necessity

Application Fee not applicable to Applicants in the non-Undue Concentration race. L.A.M.C. § 104.03(a)(4).

73.     In fact, the amended Code makes the PCN Request process more burdensome.  Under the Code as of September 3, 2019, "If the City Council does not act on the Applicant's request within 90 days, then the City Council shall be deemed to have made the necessary findings to support the public convenience and necessity."  L.A.M.C. § 104.03(a) (Nov. 28, 2018).  Under the amended Code, "If the City Council does not act on the Applicant's request within 90 calendar days of the City Clerk's date of receipt, then the City Council shall be deemed to have not made the necessary findings to support the public convenience and necessity, the request shall be denied by operation of law, and the License application shall not be processed by DCR."  L.A.M.C. § 104.03(a).

74.     The amended Code adds requirements for PCN Requests that are not required for Applicants in the non-Undue Concentration race:

> The Applicant shall engage with and seek written input
> from the following key stakeholders for the area in which
> the proposed Business Premises will be located, which at
> a minimum should include: area Neighborhood Council;
> Los Angeles Police Department (LAPD) Division; local

> chamber of commerce; and at least one substance abuse intervention, prevention and treatment organization with the Community Plan Area. LAPD shall provide the City Council with crime data for the area, and a letter stating their position on the application request. DCR shall promulgate standards subject to City Council approval by resolution, which may be amended from time to time. DCR shall provide written notice of the Applicant's request pursuant to Section 104.05(b).

L.A.M.C. § 104.03(a)(4).

75.     The amended Code also allows Applicants to relocate their Business Premises, as further discussed below, but it places restrictions on relocations for PCN Request Applicants that are not required of Applicants from the race. L.A.M.C. § 104.03(e)(1)(iii).

76.     Thus, Defendants amended the Code to include a carve-out from the Undue Concentration/PCN Request requirements that is based solely on a date.  As will become clear below, Defendants did this to benefit the SEOWA Petitioners and other early Applicants.  In doing so, Defendants violated the clearly

established due process and equal protection rights of ARMLA Two, Gompers, and all other Applicants who applied through the PCN Request process.

77.     Third, the amended code removes the sensitive use requirement that the Applicant's Business Premises be at least 700 feet from other Applicants. L.A.M.C. § 104.06.1(b)(7).  Before the amendment, if two winning Applicants had Business Premises within 700 feet of each other, the applicant with the faster application time was selected and the other applicant was ineligible for a license. L.A.M.C. § 104.06.1(b)(5).

78.     Fourth, the amended code allows Applicants to relocate their Business Premises.  Before the amendment, Defendants had maintained the position that Applicants would not be allowed to relocate their Business Premises during the licensing process.

E. **Plaintiffs Discover Pretext and Targeting**

79.     Shocked that Defendants would settle the SEOWA Petitioners' lawsuit on such terms, ARMLA One began investigating the facts.  The California Secretary of State filings for the Social Equity Owners Association, Inc. identify three individuals associated with the company: CEO, Secretary, and CFO.  The CFO is petitioner Shockley.  All three of the CEO, Secretary, and CFO are

Applicants who logged into Accela before 10:00 a.m. on September 3, 2010.[13]  All three individuals finished in the race outside of the first 100 Applicants but within the first 200 Applicants.[14]

80.     In other words, Defendants were so desperate to avoid scrutiny of their actions and to ensure the cheating Applicants who logged into Accela before 10:00 a.m. on September 3, 2019 could keep their winning statuses that Defendants settled a lawsuit over unfair early Accela logins even though the petitioners who brought the lawsuit logged in early, and Defendants settled the lawsuit by amending the Code to grant licenses to the petitioners who logged in early; amending the sensitive use requirements to ensure the petitioners' Business Premises would not become ineligible because of lower-numbered Applicants; amending the Code to allow the petitioners to relocate their Business Premises; and

---

[13] Appendix A to City of Los Angeles Office of the City Administrative Officer, *Performance Audit of the Department of Cannabis Regulation Phase Three Application Process*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/DCR%20Phase%20III%20Round%201%20Licensing%20Performance%20Audit%20and%20Review%2003.27.2020.pdf.

[14] Los Angeles Department of Cannabis Regulations, *Phase 3 Retail Round 1 Submissions*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/Phase%203%20Retail%20Round%201%20Application%20Submissions.pdf.

amending the Code so the Undue Concentration limits do not apply to the petitioners in case lower-numbered Applicants cause the petitioners' Community Plan Areas to reach Undue Concentration.

81.   ARMLA One further discovered that other selected Applicants from among the first 100 finishers in the race have Business Premises within 700 feet of sensitive uses, but Defendants did not revoke those Applicants' selections.  Such sensitive uses include a school (the same sensitive use near ARMLA One's Business Premises), a library, and a public park.  All those Applicants logged into Accela before 10:00 a.m. on September 3, 2019.  Notably, the licensing map on the Department's website does not list the school sensitive use, even though the school received its state license and opened to students years before Phase Three, Round One began.

82.   Defendants overlooked other rule violations by their preferred Applicants.  Under the Code as of September 3, 2019, Social Equity Applicants "[m]ay only transfer control or ownership to Persons who meet the same social equity ownership and local requirements as when the License was issued and only upon the prior written approval of DCR."  L.A.M.C. § 104.20(h)(i)(1) (June 14, 2019).  Nevertheless, several news sources report, and Plaintiffs allege on information and belief, that the co-owner/financial backer of several Applicants

selected from among the 100 winners in the Phase Three, Round One race included a provision requiring the Social Equity Applicants to sell their shares to the co-owner/financial backer for far below market value.  Defendants must have been aware of this forced-sale provision because Applicants were required to "disclose any options to purchase equity or control in the Applicant" as part of the Phase Three, Round One application materials.  L.A.M.C. § 104.20(h)(i)(8) (June 14, 2019).  In fact, Defendants emphasized this disclosure requirement during workshops they held for Applicants before September 3, 2019, stating: "Additionally, an Applicant must provide DCR all agreements or contracts the Applicant or its owners have entered into concerning the distribution of the business' profits or revenues or the right to control the business, including but not limited to, subscription agreements, management agreements, loan agreements, and profit-sharing agreements."[15]

83.    Notwithstanding the forced-sale provision, Defendants have not revoked the winning statuses of the co-owner/financial backer's applications.  The

---

[15] Department of Cannabis Regulation, *Presentation to Phase 3 Round 1 Licensing and Social Equity Program Workshop*, *available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/8_6%20WORKSHOP%20PRESENTATION.pdf.

co-owner/financial backer's CEO sits on a City board of commissioners.  News sources report, and Plaintiffs allege on information and belief, that the co-owner/financial backer employs the son of a City Councilmember.  Based on an analysis of Applicant company names, Plaintiffs believe they have identified seven Applicants co-owned by the co-owner/financial backer.  All seven of these Applicants logged into Accela before 10:00 a.m. on September 3, 2019.

84.     In light of the above, it is clear that Defendants have colluded with their preferred Applicants to allow them to apply early in the Phase Three, Round One race; to falsify time stamps to prevent public inquiry into the collusion; to select the preferred Applicants as winners from among the first 100 Applicants despite defects with their Business Premises; to amend the Code so those preferred Applicants will not become ineligible because earlier Applicants have Business Premises 700 feet; to amend the Code so the preferred Applicants will not become ineligible if their Community Plan Areas reach Undue Concentration; to remove from the Department's licensing map a sensitive use that would make a preferred Applicant ineligible; to amend the Code so those preferred Applicants can relocate their Business Premises before the sensitive uses are discovered; and to overlook any other Code violations by their preferred Applicants.

85.    It is also clear that Defendants targeted ARMLA One and used the preschool as a pretext to revoke ARMLA One's selection.  Defendants viewed ARMLA One as a whistleblower because ARMLA One repeatedly raised to Defendants and the City Council defects with the retail licensing procedures and the Code; ARMLA One warned Defendants before the Phase Three, Round One race that some Applicants would apply early; and ARMLA One was not afraid to disclose sensitive uses, including the preschool near ARMLA One's own Business Premises.  Defendants, at Ms. Packer's direction, revoked ARMLA One's winning status hoping that ARMLA One would disappear and not cause Defendants further problems or expose Defendants' misdeeds retarding the Phase Three application process.  At Ms. Packer's direction, Defendants revoked ARMLA One's winning status over a preschool that had not opened as of the date of ARMLA One's application, yet Defendants did not revoke the selection of their preferred Applicants who cheated in the race and were within 700 feet of sensitive uses, including a school that had been open for years before the Phase Three, Round One application period began.

**F.  Defendants Violate the Dormant Commerce Clause**

86.    As noted above, Defendants separated the retail cannabis licensing process into Phase Three, Round One and Phase Three, Round Two.  Defendants

have not yet announced the dates for the Phase Three, Round Two application period.  Applicants who were not selected in Phase Three, Round One may apply in Phase Three, Round Two.  L.A.M.C. § 104.06.1(b)(6) ("All Applicants who submitted an application that are not eligible for further processing may apply for Type 10 Application Processing - Round 2.").[16]  ARMLA One intends to apply in Round Two if Defendants do not reinstate its award for Round One.  ARMLA Two and Gompers intend to apply in Round Two if Defendants and the City Council do not approve their PCN Requests.

87.    Defendants limited both Round One and Round Two to Applicants owned in part by individuals who qualify as Social Equity Applicants.  L.A.M.C. § 104.06.1(b)-(c).  Defendants will not accept applications for retail cannabis licenses from non-Social Equity Applicants until at least 2025.  L.A.M.C. § 104.06(a).

88.    Defendants limited Phase Three, Round One applications to Applicants owned in part by an individual who meets the definition of a Tier 1 Social Equity Individual Applicant or a Tier 2 Social Equity Individual Applicant.

---

[16] Before Defendants amended the Code in 2020, the rules governing Phase Three, Round One applications were contained in Section 104.06(c).  This section of the Compliant references the Code sections as amended.

L.A.M.C. § 104.06.1(b)(3).  The ownership requirement applied to both the non-Undue Concentration race and PCN Requests.

89.    A Tier 1 Social Equity Individual Applicant must have "1. Low Income and prior California Cannabis Arrest or Conviction; 2. Low Income and a minimum of five years' cumulative residency in a Disproportionately Impacted Area.  L.A.M.C. § 104.20(a)(1)(i)(4).  The entity applying for a retail cannabis license seeking Tier 1 classification must be 51 percent owned by a Tier 1 Social Equity Individual Applicant.  L.A.M.C. § 104.20(a)(2)(i) ("A Tier 1 Social Equity Applicant shall own no less than a 51 percent Equity Share in the Person to whom the License is issued.").

90.    A Tier 2 Social Equity Individual Applicant must have "1. Low Income and a minimum of five years' cumulative residency in a Disproportionately Impacted Area; or 2. a minimum of 10 years' cumulative residency in a Disproportionately Impacted Area."  L.A.M.C. § 104.20(a)(1)(i)(5).  The entity applying for a retail cannabis license seeking Tier 2 classification must be 33 1/3 percent owned by a Tier 2 Social Equity Individual Applicant.  L.A.M.C. § 104.20(a)(2)(i). ("A Tier 2 Social Equity Applicant shall own no less than a 33 1/3 percent Equity Share in the Person to whom the License issued.").

91.    For Phase Three, Round One, "Disproportionately Impacted Area" means "eligible zip codes based on the 'More Inclusive Option' as described on page 23 of the 'Cannabis Social Equity Analysis Report' commissioned by the City in 2017, and referenced in Regulation No. 13 of the Rules and Regulations, or as established using similar criteria in an analysis provided by an Applicant for an area outside of the City."  L.A.M.C. § 104.20(a)(1)(i)(2).  The eligible zip codes published by Defendants are 90001, 90002, 90003, 90008, 90011, 90013, 90014, 90016, 90021, 90027, 90033, 90037, 90043, 90044, 90057, 90058, 90059, 90061, 90062.

92.    Notwithstanding that Section 104.20(b) nominally provides a method for an applicant to attempt to have a zip code from outside the City of Los Angeles qualify as a Disproportionately Impacted Area, Defendants implemented the Disproportionately Impacted Area requirement with the intention of impeding non-Californians from obtaining retail cannabis licenses.  In fact, Defendants published guidance for prospective Social Equity Applicants that indicates that only the designated Los Angeles zip codes qualify:

"For the purposes of the [Social Equity Program], an

Applicants [sic] must provide evidence of cumulative

residency for either a period of 5 years or 10 years in a

40
COMPLAINT

Disproportionately Impacted Area (DIA). At least one

dated document must be provided for each qualifying year.

The City commissioned a Social Equity Program Analysis

which determined that the following zip codes are to be

considered Disproportionately Impacted Areas: (90001,

90002, 90003, 90008, 90011, 90013, 90014, 90016,

90021, 90027, 90033, 90037, 90043, 90044, 90057,

90058, 90059, 90061, 90062).[17]

This guidance neither informs potential Social Equity Applicants that they can ask

Defendants to consider other zip codes nor informs potential Social Equity

Applicants where to find more information about Disproportionately Impacted

Areas.

93.    Defendants verified more than 1,600 Social Equity Applicants to

participate in Phase Three, Round One.  In response to ARMLA One's public

records request as to whether Defendants verified any Social Equity Applicant

---

[17] *Department of Cannabis Regulation (DCR) Social Equity Program Applicant Eligibility Verification List of DCR Approved Documents, available at* https://cannabis.lacity.org/sites/g/files/wph1171/f/Social%20Equity%20Program%20Applicant%20Eligibility%20Verification%20-%20List%20of%20Approved%20Documents.pdf.

based in whole or in part on residency in a zip code other than those listed above, Defendants responded, "All Social Equity Individual Applicants were deemed eligible based on residency in the zip codes provided by the City."

94.     For Phase Three, Round One, "California Cannabis Arrest or Conviction" means "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016." L.A.M.C. § 104.20(a)(1)(i)(1).

95.     Defendants limited Phase Three, Round Two applications to Applicants owned in part by an individual who meets a revised definition of Social Equity Individual Applicant. L.A.M.C. § 104.06.1(c)(1), (3). Under the definition applicable to Round Two, a Social Equity Individual Applicant must have "a prior California Cannabis Arrest or Conviction and must also meet one of the following two criteria, as defined in Section 104.20(b)(1)(i): (1) Low-Income; or (2) ten years' cumulative residency in Disproportionately Impacted Area." L.A.M.C. § 104.06.1(c)(3); L.A.M.C. § 104.20(b). The entity applying for a retail cannabis license in Phase Three, Round Two must be 51 percent owned by a Social Equity Individual Applicant who meets this revised definition. L.A.M.C. § 104.06.1(c)(3).

96.     For Phase Three, Round Two, "California Cannabis Arrest or Conviction" continues to mean "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016." L.A.M.C. § 104.20(b)(1)(ii)(3).

97.     For Phase Three, Round Two, "Disproportionately Impacted Area" means Police Reporting Districts as established in the Expanded Social Equity Analysis, or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City." L.A.M.C. § 104.20(b)(1)(ii)(4).  The qualifying Police Reporting Districts are within the City of Los Angeles.[18]

98.     Defendants established these laws governing Phase Three, Round One and Phase Three, Round Two for the purpose of favoring California residents over out-of-state Applicants.

99.     By establishing the residency requirement, Defendants violated clearly established law.  *See, e.g., Tennessee Wine & Spirits Retailers Ass'n v.*

_____

[18] *See* Rules and Regulations for Cannabis Procedures Rule 13, *available at* https://cannabis.lacity.org/sites/g/files/wph1081/f/Amendments%20to%20Cannabis%20Regulations.CLEAN_.7.23.18.pdf.

43
COMPLAINT

*Thomas*, 139 S. Ct. 2449 (2019); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.

Ct. 848 (1996); *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*,

511 U.S. 93 (1994); *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951).

## FIRST CAUSE OF ACTION

### (Deprivation of Equal Protection, 42 U.S.C. § 1983)

### (ARMLA One against all Defendants)

100.   Plaintiffs reallege and incorporate herein by reference each of the

allegations set forth in the preceding paragraphs of the Complaint as though fully

set forth herein.

101.   Defendants, at the direction of Ms. Packer, targeted ARMLA One and

revoked its selection as a winning Applicant for a retail cannabis license in the

Phase Three, Round One application race.  Defendants did not revoke the selection

of other Applicants with Business Premises that did not qualify for licensing as of

the application date.  Defendants used the preschool as a pretext to revoke

ARMLA One's selection.  Defendants' acted in an arbitrary and capricious manner

in revoking ARMLA One's selection as a winning Applicant, and Defendants have

no rational basis for their actions.  Defendants acted with the intent to deprive

ARMLA One of its rights or in reckless disregard of its rights.  In doing so,

Defendants violated clearly established law.

102.   As a result, ARMLA One was deprived of a retail cannabis license and damaged in an amount in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**(Deprivation of Due Process, 42 U.S.C. § 1983)**

**(ARMLA One against all Defendants)**

103.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

104.   Defendants, at the direction of Ms. Packer, targeted ARMLA One and revoked its selection as a winning Applicant for a retail cannabis license in the Phase Three, Round One application race.

105.   Defendants did not, however, revoke the selection of Applicants with ineligible Business Premises provided the Applicants logged into Accela before 10:00 a.m. on September 3, 2019.  Thus, Defendants, at the direction of Ms. Packer, drew an irrational and arbitrary classification.  In doing so, Defendants' actions violated clearly established law.

106.   As a result, ARMLA One was deprived of a retail cannabis license and damaged in an amount in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Deprivation of Equal Protection, 42 U.S.C. § 1983)

### (ARMLA Two and Gompers against all Defendants)

107.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

108.   Defendants apply different laws regarding areas of Undue Concentration to Applicants based on the date of application and with the intention of benefitting a subset of Applicants.  In doing so, Defendants violated the clearly established equal protection rights of ARMLA Two and Gompers.  *See Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809 (9th Cir. 2016).

109.   As a result, ARMLA Two and Gompers were deprived of retail cannabis licenses and damaged in an amount in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Dormant Commerce Clause – Round One, 42 U.S.C. § 1983)

### (All Plaintiffs against All Defendants)

110.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

111.   A state, including its subdivisions, may not enact laws that discriminate against citizens of other states.  *See, e.g., Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S. Ct. 848 (1996); *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93 (1994); *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951).

112.   Defendants enacted laws that limited applications for retail cannabis licenses in Phase Three, Round One to California residents.  In doing so, Defendants violated Plaintiffs' rights under the United States Constitution.

113.   The residency requirement harms each Plaintiff because it limits Plaintiffs' ability to sell equity and raise capital. The residency requirement decreases the value of Plaintiffs by limiting the pool of possible shareholders and investors.  Plaintiffs were in discussions with out-of-state investors, but could not proceed with any investment because of the ownership restrictions under the Code.

114.   Injunctive relief is necessary because the residency requirements violate the United States Constitution and subjects Plaintiffs to serious, concrete, and irreparable injuries.

## FIFTH CAUSE OF ACTION

**(Dormant Commerce Clause – Round Two, 42 U.S.C. § 1983)**

**(All Plaintiffs against All Defendants)**

115.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

116.   A state, including its subdivisions, may not enact laws that discriminate against citizens of other states.  *See, e.g., Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S. Ct. 848 (1996); *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93 (1994); *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951).

117.   Defendants enacted laws that will limit applications for retail cannabis licenses in Phase Three, Round Two to California residents.  In doing so, Defendants violated Plaintiffs' rights under the United States Constitution.

118.   The residency requirement harms each Plaintiff because it limits Plaintiffs' ability to sell equity and raise capital. The residency requirement decreases the value of Plaintiffs by limiting the pool of possible shareholders and

investors.  Plaintiffs were in discussions with out-of-state investors, but could not proceed with any investment because of the ownership restrictions under the Code.

119.   Injunctive relief is necessary because the residency requirements violate the United States Constitution and subjects Plaintiffs to serious, concrete, and irreparable injuries.

## SIXTH CAUSE OF ACTION

**(Declaratory Relief – Round One, 28 U.S.C. § 2201)**

**(All Plaintiffs against All Defendants)**

120.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

121.   Defendants' residency requirements for Phase Three, Round One violate the dormant Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution.  An actual controversy exists between Plaintiffs and Defendants as to whether Defendants may enforce the residency requirements.

122.   Declaratory relief is necessary to resolve this dispute.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief – Round Two, 28 U.S.C. § 2201)

### (All Plaintiffs against All Defendants)

123.   Plaintiffs reallege and incorporate herein by reference each of the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

124.   Defendants' residency requirements for Phase Three, Round Two violate the dormant Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution.  An actual controversy exists between Plaintiffs and Defendants as to whether Defendants may enforce the residency requirements.

125.   Declaratory relief is necessary to resolve this dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief as follows:

1.  For the first, second, and third claims, an award of compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial.

2.  An injunction requiring Defendants to reinstate ARMLA One as a selected Applicant from the Phase Three, Round One application race.

50
COMPLAINT

3. An injunction requiring Defendants to process ARMLA Two's application for a retail cannabis license.

4. An injunction requiring Defendants to process Gompers's application for a retail cannabis license.

5. In the alternative, injunction prohibiting Defendants from processing any applications for retail cannabis licenses from Phase Three, Round One.

6. Injunction prohibiting Defendants from proceeding with the Phase Three, Round Two.

7. A declaration that the residency requirements of Phase Three, Round One are unconstitutional.

8. A declaration that the residency requirements of Phase Three, Round Two are unconstitutional.

9. An award of attorneys' fees and costs.

10. For such other and further relief as this Court shall deem appropriate

DATED: August 31, 2020          DAVID BAUM LAW CORPORATION

*David M. Baum*
_____
David M. Baum
*Attorney for plaintiffs ARMLA One, Inc., ARMLA Two, Inc., and Gompers SocEq, Inc.*

51
COMPLAINT

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues and causes of actions so triable.

DATED: August 31, 2020          DAVID BAUM LAW CORPORATION

*David M. Baum*

David M. Baum
*Attorney for plaintiffs ARMLA One, Inc., ARMLA Two, Inc., and Gompers SocEq, Inc.*